**COMMISSIONER OF INTERNAL
REVENUE.
v.
STRAUS.**

**No. 10849.**

United States Court of Appeals,
Seventh Circuit.

Nov. 10, 1953.

H. Brian Holland, Asst. Atty. Gen.,
Joseph F. Goetten, Ellis N. Slack, Hilbert P. Zarky, Sp. Assts. to the Atty.
Gen., for petitioner.

Roswell Magill, New York City (Allen
H. Merrill and Albert Rosenblum, New
York City, of counsel), for respondent.

Before DUFFY, FINNEGAN and
LINDLEY, Circuit Judges.

FINNEGAN, Circuit Judge.

This is a petition by the Commissioner of Internal Revenue for review of a
decision of the Tax Court entered on
July 31, 1952, which decided that there
was no deficiency in income tax for the
year 1944 due from taxpayer Martin L.
Straus, II.

The facts as found by the Tax Court
may be summarized as follows:

In 1938, the taxpayer, Martin L.
Straus, II, acquired certain stock of a
corporation, then known as the Wahl
Company, and hereinafter referred to as
Eversharp, or as the Company. The corporation was engaged in the manufacture of writing implements and other
products. In 1940, Straus owned more
than 5000 shares of common stock and
a considerable amount of the preferred
stock of Wahl.

The taxpayer, Straus, had by that
time become a director, and in December of 1940 was chosen as chairman of
the executive committee of the board of
directors. In the spring of 1941, he was
elected president of the Company, and
he continued to hold such offices for
about ten years.

At the beginning of 1940 the Company, then known as Wahl, was in a very
unsatisfactory condition. It had incur-

red losses in all but two of the sixteen years in which it had done business, and had paid no dividends on its common stock during most of the time. It was also heavily in arrears on dividends on its cumulative preferred stock. In 1940, the Company, under the direction of Straus, was reorganized by the merger into itself of one of its wholly owned subsidiaries. Its name was then changed to Eversharp, Inc.

Within a few months after the reorganization, the Company, under the direction of the taxpayer Straus, began the marketing of a new product and adopted a national advertising news program. It also made changes in its managerial personnel.

Upon the reorganization of 1940, the Company was authorized to issue 200,000 shares of preferred stock, together with common stock. Stockholders had preemptive rights to subscribe to new shares of common stock issued in excess of 150,000 shares. Since 117,048 shares of common stock had been issued in the reorganization of the outstanding stock of the Wahl Company, there were left 32,952 shares of unissued common stock free from stockholders' preemptive rights.

During the year 1941, the taxpayer Straus, and the executive committee of the Company discussed for the first time the adoption of the stock option plan which would reserve those shares for option at a future time at a fixed price to the executive and supervisory officials of the Company.

In October, 1942, Straus was asked by the Company's Board of Directors to formulate a plan respecting the issuance of the 32,952 shares. On December 8 of that year, the Board unanimously agreed that such shares would be so issued over a period of three to five years and that all shares, whether issued then or later, should be sold to employees at a price of $6 per share. The market price of Eversharp's common stock on December 8, 1942, was $4.50 per share, or $1.50 less than the price fixed by the Board.

The plan agreed upon at the December 8, 1942 meeting was formally adopted and embodied in a corporate resolution at the January 27, 1943, meeting of Eversharp's Board. As set forth in the minutes of December 8th the stock option plan was adopted:

"* * * as a means of making it possible for the Company's principal officers and supervisory employees to increase their equity holdings in the Company and thereby insure the permanence of their association with the Company * * *"

The plan included the following terms of purchase, among others:

(1) the option price for all shares was fixed at $6 per share;

(2) the options were not assignable (except that in the event of the optionee's death they passed to his personal representative); and

(3) the optionee was required still to be in the Company's employ at the time the option was excercised (unless his employment had been terminated solely because of incapacity resulting from accident or ill health).

Under the resolution adopted at the January 27, 1943, meeting, 22,000 of the 32,952 shares reserved under the plan were then allotted to named individuals, including 10,000 shares to Straus. The balance of 10,952 shares not so allotted was reserved, earmarked and set aside for purchase "on the same terms, under similar options, from time to time in the future, by such other officers and employees of the Company as may be determined from time to time by the Executive Committee of the Board of Directors * * *."

On January 27, 1943, when the option plan was formally adopted by the Board, the market price of Eversharp's common stock was $6.87 per share. On May 29, 1943, when the market price of the stock had increased to $17.25 per share, a written option agreement in respect of the 10,000 shares allotted to Straus on January 27, 1943, was issued to him. In a letter to the Company dated Oc-

tober 2, 1947, the Commissioner ruled that the purchase of 10,000 shares allotted to Straus and the 12,000 shares allotted to various other individuals on January 27, 1943, did not result in taxable income to them.

At a meeting originating on June 2, 1944, and reconvened on June 7, 1944, 2,500 additional shares were allotted to Straus under the Company's stock option plan. These are the shares with which we are concerned in this case. A written option agreement with respect to those 2,500 additional shares was delivered to Straus on June 27, 1944. The terms of that agreement, including the price of $6 per share, were in accordance with the resolution of January 27, 1943, wherein, as stated above, the Board of Directors provided that the balance of the 10,952 unallotted shares was reserved, earmarked and set aside for purchase under the plan "on the same terms, under similar options, from time to time in the future, by such other officers and employees of the Company as may be determined from time to time by the Executive Committee of the Board of Directors; * * *"

On June 30, 1944, Straus exercised his option and purchased 2,500 shares of Eversharp common stock at a price of $6 per share. The market price of the Company's common stock on June 2, 7 and 30, 1944, was $23.25, $23.75 and $28 per share, respectively.

On its original return for the year 1944, Eversharp did not claim a deduction in respect of the 2,500 shares sold to Straus on June 30, 1944.

During the fiscal years ended the last day of February, 1940 to 1946, when Straus was president and a director of Eversharp, its net sales increased fifteen-fold, viz., from $2,001,674 to $29,080,850, and its earnings jumped from a loss of $345,913 in 1941 to a net profit before taxes of $5,602,445 and a net profit after taxes of $1,805,445 in 1946.

In 1942, 1943 and 1944, Straus's salary from Eversharp and the Eversharp, Inc. War Products Division, a wholly owned subsidiary, was $50,833.31, $78,996 and $78,996, respectively.

Upon its review of all the competent evidence of record, the Tax Court reached the following conclusion:

"The plan as a whole and the surrounding circumstances indicate an intent to give the officers and employees a proprietary interest in the business rather than to compensate them * * *.

\* \* \* \* \* \*

"We conclude, therefore, that the transaction was in fact what its form indicates, the purchase of employer's stock by petitioner under an option granted him by the employer not to compensate for services rendered or to be rendered, but to give him a proprietary interest in the business."

Accordingly, the Tax Court entered its decision that there was no deficiency in Straus's income tax for the calendar year 1944.

The Commissioner here contends that the Tax Court erred in holding that the gain of $55,000, allegedly realized by taxpayer when he was permitted by his employer to purchase 2,500 shares of the Company's stock at a price of $6 per share at a time when such stock had a market value of $28 per share.

He says:

"Commissioner [of Internal Revenue] v. Smith, 324 U.S. 177 [65 S.Ct. 591, 89 L.Ed. 830], authoritatively settles the proposition that an employee realizes taxable gain when he acquires property from his employer at a price less than market value pursuant to the exercise of an option which is granted as compensation for services."

We can perceive a marked distinction between the Smith case and the case at bar. Here the Tax Court after its consideration of the facts and circumstances shown by the evidence in the record concluded that the plan as a whole and the surrounding circumstances, indicate an intent to give the officers and employees

a proprietary interest in the business rather than to compensate them.

On the other hand, the Tax Court found in the Smith case that the option was given as compensation for services. The Supreme Court stated that it could discover no basis for disturbing the findings of the Tax Court and therefore concluded that the Tax Court had correctly applied the law to the facts there found.

■■■ In the case at bar, we can find no basis for disturbing the findings and conclusions of the Tax Court, and are bound thereby. Cf. Locomotive Engineers, etc., Ass'n v. Laurent, 7 Cir., 172 F.2d 889–894.

The Commissioner includes in his brief Section 29.22(a)–1 of Regulations 111 promulgated under the Internal Revenue Code.

This section, as amended, after the Supreme Court decision in Commissioner of Internal Revenue v. Smith, 324 U. S. 177, 65 S.Ct. 591, 89 L.Ed. 830, is not properly applicable to the case under review, as a resume of its history will demonstrate.

After the decision of the Supreme Court in the Smith case, Treasury Regulations 111, Section 29.22(a)–1 were amended to provide:

> "If property is transferred by an employer to an employee for an amount less than its fair market value, regardless of whether the transfer is in the form of a sale or exchange, the difference between the amount paid for the property and the amount of its fair market value, is in the nature of compensation and shall be included in the gross income of the employee." T.D. 5507, April 12, 1946, 1946–1 C.B. 18.

However, the amended regulations, by their very terms, were not to apply to options granted prior to February 26, 1945, the date of decision in the Smith case. The language of the regulation is as follows:

> "* * * In the case of property transferred by an employer to an employee pursuant to the exercise of an option granted to the employee before February 26, 1945, the provisions of these regulations prior to the amendment made by this Treasury decision shall apply." T.D. 5507, 1946–1 C.B. 18; A. Rosenberg, 20 T.C.–, No. 2, April 6, 1953.

In the instant case the option was granted and exercised before February 26, 1945, hence the only regulations applicable here are those in effect prior to the current regulations.

Before the amendment of April 12, 1946, the pertinent part of Regulation 111 Sec. 29.22(a)–1 provided that:

> "If property is transferred by a corporation to * * * an employee, for an amount substantially less than its fair market value regardless of whether the transfer is in the guise of a sale or exchange, such * * * employee shall include in gross income the difference between the amount paid for the property and the amount of its fair market value to the extent that such difference is in the nature of (1) compensation for services rendered or to be rendered."

After careful consideration of the facts and circumstances of the case at bar, the Tax Court concluded that the plan as a whole and the surrounding circumstances indicate an intent to give executive and supervisory employees a proprietary interest in the business, and was not designed or intended as a plan for increasing compensation.

Since these findings and conclusions of the Tax Court are supported by substantial evidence and are not clearly erroneous, we are bound thereby.

The decision of the Tax Court is

Affirmed